[Civ. No. 2386.   Third Appellate District.—March 16, 1922.]

## PACIFIC STATES CORPORATION (a Corporation), Appellant, v. FRED GILL et al., Respondents.

[1] Agency—Contract Between Foreman of Ranch and Owner—Caring and Marketing of Cattle—Special Agency—Unauthorized Sale Under General Authority.—Under a contract by the terms of which the foreman of a stock ranch was to take his employer's cattle to his own ranch and feed, water, and fatten them, and providing that the cattle were to be marketed at such times and for such prices as should be mutually agreed upon, and the proceeds, after deducting a certain sum, divided between them, the foreman had no authority to sell the cattle under any general power he might have had as his employer's agent to buy and sell cattle and other domestic animals, since such contract was, in effect, a contract of bailment, and under it the foreman was a depositary of the cattle for hire.

[2] Id. — Special  Authorization — Evidence — General  Agency. — Where the authority to do a particular thing under a written contract between two parties must alone be found in the contract itself, or, in other words, where authority to do an act by one party to a written contract cannot be exercised except upon the express agreement or consent of the other party thereto, mere evidence of the fact that the party assuming to perform such act was, prior to and at the time of the making of such written contract, the agent of the other cannot of itself justly be held to be proof of authority given to the agent by the principal to do such act.

[3] Id.—Receipt and Acceptance of Check—Insufficient Ratification of Sale.—A check sent by by the foreman to the employer at about the time of the foreman's unauthorized sale of the cattle is not to be presumed as in payment of the employer's interest in the cattle, and its acceptance is not a ratification of the sale where the employer at the time of the receipt was without knowledge of the sale.

APPEAL from a judgment of the Superior Court of Tulare County.   W. B. Wallace, Judge.   Reversed.

The facts are stated in the opinion of the court.

1.  Power of bailee to make sale, note, 66 Am. Dec. 758.

Farnsworth, McClure & Burke and Howard S. Lewis for Appellant.

Lamberson & Lamberson and Karl A. Machetanz for Respondents.

HART, J.—This is an action for damages for the alleged conversion of 257 head of steers, property of the plaintiff, it being the contention of the latter that said steers were, without authority or right, sold to the defendants by one George H. Loughery, who at the time of said sale had possession of said animals.

The cause was tried before a jury. At the close of plaintiff's case a motion for a nonsuit was granted as to the defendant Western Meat Company. The jury gave the defendants a verdict, and thereafter a motion was made by the plaintiff for a new trial upon all the statutory grounds appropriate to a verdict for a defendant in a civil action for damages. (Sec. 657, Code Civ. Proc.) Said motion having been denied, judgment was thereupon entered in favor of the defendants. This appeal, supported by a bill of exceptions, is by the plaintiff from the judgment so entered.

The plaintiff was at the time of the transaction involved herein engaged in the business of raising, buying, and selling beef cattle in Tulare County. The cattle were kept and ranged on lands belonging to the plaintiff in said county, one of said tracts of land being known as the "Tagus Ranch." G. H. Loughery was at the times referred to in the complaint also engaged in the stock-raising business on lands owned by him and situated in Tulare County and not far distant from the cattle ranges of the plaintiff. Loughery, it may here be stated, was, during a portion of the year 1915, employed by the plaintiff on the Tagus Ranch as one of the foremen having charge of the stock of the plaintiff on said ranch.

On the twenty-fifth day of September, 1915, the plaintiff and the said G. H. Loughery entered into a written agreement, by the terms of which said plaintiff was to and did turn over to the possession of said Loughery 257 head of beef cattle, weighing in the aggregate 201,560 pounds, "to be fed and marketed upon the terms and conditions herein contained." Said agreement provided that the said cattle were

to be taken by Loughery to his ranch in Tulare County, consisting of 1,065 acres and known as the "Ammawage Ranch," and there feed, water, and fatten said cattle, "giving them the best of care until marketed and sold as provided in this agreement." The agreement further provided that Loughery at his own expense should "provide all water, feed, and help necessary to properly feed and fatten said cattle so that they shall be ready for slaughter for the California fall and winter trade of 1916 and 1917, it being agreed that no cattle shall be marketed earlier than September 1, 1916, and that all shall have been fattened and marketed by not later than March 1, 1917." The agreement proceeds:

"Said cattle may be sold in whole, or in part at any time between said last mentioned dates, but said Loughery agrees to notify Pacific States Corporation by written notice mailed to it at the Merritt Building, Los Angeles, California, whenever he is ready to have any of said cattle sold, stating the number of head ready to be marketed and giving Pacific States Corporation an opportunity to co-operate with him in obtaining the best price for said cattle. It is agreed that said cattle shall be marketed only at such times and for such price as shall be mutually agreed upon by said Pacific States Corporation and said Loughery; provided, however, that in the event said parties fail to agree as to said matter, or as to whether said cattle are being properly fattened or as to whether said cattle are in proper condition to be sold as fat beef cattle for killing purposes, then the decision in said matters shall be left to Mr. James C. Drake, president of Los Angeles Trust and Savings Bank, Los Angeles, California, as sole arbitrator, and his decision in said matters, and each of them, shall be final. As said cattle are marketed and sold, all the proceeds therefrom shall be paid over to Pacific States Corporation until 201,560 pounds net weight (this being the total number of pounds that the cattle weighed at the time of their delivery to Loughery) of said cattle shall have been sold. Thereafter, as any of said cattle are sold, two-thirds of the selling price shall be paid over to Pacific States Corporation and one-third thereof to said Loughery, until all of said cattle are sold."

The agreement finally provides that after all said cattle have been marketed and paid for a final settlement shall be had between the parties to the agreement, whereby the plaintiff shall be allowed credit for 201,560 pounds of cattle weighed in at the commencement of "this feeding agreement at the average price per pound received for all of said cattle and the balance received for said cattle shall be divided equally between Pacific States Corporation and said G. H. Loughery, taking into account the moneys received by the respective parties prior to said final settlement." In other words, Loughery was to receive fifty per cent of all increase made in weight by said cattle "by growth and feeding," after the plaintiff had received payment for the cattle as weighed at the time of the execution of the agreement, to wit, 201,560 pounds. The final clause of the agreement provides that said Loughery, by not later than March 1, 1917, "shall cause to be sold under this contract at least 201,560 pounds of fat, marketable, beef cattle."

The complaint alleges that on or about the fifteenth day of June, 1916, the plaintiff was the owner of and entitled to the immediate possession of the cattle referred to in the above agreement; that the value of said cattle on said day was $35,924; "that on or about said last-mentioned day, and while the plaintiff was the owner of, and entitled to the immediate possession of said cattle, as aforesaid, the above-named defendants, and each of them, wrongfully took and carried away said personal property, said 257 head of cattle, and disposed of the same, and converted the same to their own use, to the damage of the plaintiff in the sum of $35,924."

The answer, after specifically denying the essential or vital averments of the complaint, sets up three special defenses, to wit: 1. That during the year 1915 and a portion of the year of 1916 said George H. Loughery, with other men, were employed by the plaintiff on its said Tagus Ranch; that during a portion of said years the said Loughery was held out by the plaintiff to be a manager of the business of said plaintiff at said ranch, "and the said George H. Loughery was, during said time, held out by the plaintiff to be and was actually in control of the buying and selling of cattle at said Tagus Ranch; that in the month of December, 1915, the defendants believing from the appearances, as

such appearances were presented to them at the time, and from the fact that said George H. Loughery was, during such time, occupying the position as manager of said Tagus Ranch, and was and had been for several months prior thereto actually engaged in the business of buying and selling cattle for and on behalf of said Pacific States Corporation, plaintiff herein at said Tagus Ranch, and believing that the said George H. Loughery was the manager of said Pacific States Corporation for the purpose of buying and selling cattle, did purchase from said George H. Loughery, as the agent of said Pacific States Corporation, about 246 head of cattle which defendants believe are a portion of the same cattle attempted to be described by the plaintiff in its complaint on file herein, but the said defendants did not purchase or receive from the said George H. Loughery, or from any other person, 257 head of cattle." It is further alleged, in connection with this defense, which, as will be observed, is that of ostensible agency, that said defendants, at the time that they made such purchase, paid to said Loughery "as the agent and manager of said Pacific States Corporation" the full amount and value of said cattle so purchased, "and at said time believed that the said Loughery had full and complete authority as the agent of said plaintiff to sell said cattle and receive payment therefor"; that said Loughery had possession of said cattle and delivered possession thereof to defendants at the city of Visalia in said county of Tulare, at the time of the purchase of the same by the defendants, who at said time believed said Loughery to be the agent of the plaintiff herein. 2. That the plaintiff is estopped from denying the agency of Loughery and the full power of the latter to sell the cattle in question as the agent of the plaintiff for the reason that the plaintiff by its own acts and conduct, at the time of the purchase of said cattle by the defendants, led the latter to believe that said Loughery was its manager and agent for the purpose of buying and selling cattle and that by reason of such acts and conduct "the plaintiff caused the defendants to change their position in the premises and to purchase the said cattle from the said George H. Loughery as the manager and agent of the plaintiff at said Tagus Ranch," etc. 3. That at the time of the sale of said cattle to the defendants by said Loughery the plaintiff was the owner of an undivided

two-thirds interest and the said Loughery the owner of an un-
divided one-third interest in and to said 246 head of cattle so
sold to defendants; that at the time of said sale said Loughery
had full power and authority to sell, market, and dispose of
said cattle or any part thereof, and during all of said time
said Loughery had possession of said cattle; that (on in-
formation and belief) immediately after the sale and delivery
of said cattle by said Loughery to defendants the former de-
livered and paid to the plaintiff two-thirds of the sum which
was then and there paid by defendants to said Loughery as
the purchase price of said cattle, to wit, the sum of $7,583,
"and that said sum was the true value of the share and
interest of said plaintiff in said cattle at the time of said
sale and the delivery thereof."

It is manifest from the special defenses set up in the
answer that the theory upon which issue was tendered by the
defendants was that Loughery, in the transactions involved
in the sale of the cattle to the defendants, was the ostensible
agent of the plaintiff, with authority to negotiate the sale.
The second special defense, which is that of estoppel, really
amounts to no more than that of ostensible agency. In the
brief of respondents, however, it is claimed that the testi-
mony shows actual agency in Loughery, or, in other lan-
guage, that Loughery was actually the agent of the plaintiff,
with full authority to negotiate the sale of the cattle re-
ferred to in the pleadings to the defendants. Counsel for
the plaintiff, in their closing brief, state that the defend-
ants, in accordance with the theory upon which their answer
was framed, presented the case below upon the hypothesis
of ostensible agency, but that since the appeal has been taken
they have abandoned the theory of ostensible agency and
adopted that of actual agency. It is upon the theory upon
which the defendants present their appeal that the case
will be reviewed here. Indeed, it is to be stated that if the
defendants had rested their case upon the theory of ostensible
agency, it is clear that a vast amount of the testimony
offered in support of that claim would be wholly irrelevant
and incompetent, since many of the circumstances which were
brought out by the evidence at the trial occurred subse-
quently to the date of the purchase of the first lot of cattle
by the Gill Brothers from Loughery, and some occurred
even after the date in February, 1916, when the second lot

of cattle was likewise purchased. For this reason alone, upon the theory of ostensible agency, a reversal would be required, for there is no evidence showing or tending to show that at the time the purchases of the cattle were made the defendants had any knowledge of those few circumstances which occurred before the sales and which might otherwise be held to be competent as tending to establish ostensible agency. In fact, Fred Gill, the only one of the two defendants called to the witness-stand in their behalf, testified that he negotiated with Loughery for the purchase of the cattle and that he had met Loughery only a few days prior to the fifteenth day of December, 1915, on which day the first lot of cattle was purchased from Loughery by him. He did not then know what Loughery's contractual or business relations with the plaintiff were or what his authority was, except such information upon the subject as was involved in the statement made by one Townsend when the latter introduced Loughery to said Gill as one of the foremen of the plaintiff's Tagus Ranch.

It is first contended by the defendants that there is testimony tending to show that the cattle sold and delivered to the Gill Brothers by Loughery were not the cattle as to which the written contract between the plaintiff and Loughery was made. In other words, it is the claim that the cattle sold to the Gill Brothers were not the cattle described and referred to in the contract between plaintiff and Loughery. This contention, however, is at variance with the admission made by the defendants in their amended answer to the complaint, wherein they allege that the defendants "did purchase from said George H. Loughery, as the agent of said Pacific States Corporation, about 246 head of cattle which defendants believe are a portion of the same cattle attempted to be described by the plaintiff in its complaint on file herein." The second defense of the answer, as we have seen, admits that the plaintiff was the owner of a two-thirds interest in the cattle. Moreover, the claim of the plaintiff that the cattle described in the complaint were the cattle sold to the Gill Brothers is supported by the testimony of witnesses who knew the cattle and who were present at the time they were sold.

As to the present theory of the defendants, however, that Loughery, in executing the transactions culminating in the

sale of the cattle to the defendants, was the actual agent of the plaintiff, authorized as such to negotiate the sale, it will be necessary to review the evidence which it is claimed tends to establish that proposition.

It appears that at some time in the year 1913 one H. C. Merritt, Jr., became vice-president and general manager of the plaintiff and remained in those positions continuously up to and during a portion of the year 1917. Said Loughery, subsequent to the time in 1913 when Merritt became general manager of the corporation, was given employment as a foreman of plaintiff on the Tagus Ranch. Besides Loughery there were several other men employed by the plaintiff on said ranch and acting as foremen and discharging duties similar to those performed by Loughery. The cattle referred to in the complaint were kept at the Tagus Ranch down to the time of the execution of the contract between plaintiff and Loughery. Upon the making of the contract between the plaintiff and Loughery the cattle in question (257 head in number according to the plaintiff) were driven to Goshen Junction, in Tulare County, and were there weighed and delivered to Loughery. The weighing of the steers was conducted by Merritt, assisted by Loughery, a man by the name of Charles Sage, one Clark and several other persons whose names are not mentioned. After the weighing and counting of the cattle Loughery drove them from Goshen Junction to his Ammawage Ranch. At some time in the year 1916 Merritt visited the Ammawage Ranch for the purpose of inspecting the cattle. He did not see Loughery on that occasion, but saw the steers. Several months thereafter Merritt against visited the Ammawage Ranch and was informed that Loughery had departed for the east. He did not see the cattle at this time, but, inquiring of Davidson, foreman of Loughery, as to the whereabouts of the cattle, was informed by said Davidson that, all the feed on the Ammawage Range having been exhausted, the cattle had been removed and were then on the mountain pasture of Loughery. Merritt thereupon sent Loughery a wire in the east asking him about the cattle, and Loughery replied that "he had them on good feed and as soon as he came back he would show them to me." Shortly thereafter Loughery returned to Tulare County and accompanied Merritt to a place (not in the mountains) where there was a band of cattle grazing and

57 Cal. App.—7

pointed out the animals to Merritt as those mentioned in the contract. They were not, however, the cattle so referred to. Merritt became suspicious and some time later inquired of one of the employees, whom he designated as one of the "riders of our cattle," where the cattle in question were, and the said employee replied that "those cattle had been sold a long time ago to the Gill Brothers." At this time, which was in the year 1917, Loughery was at the home of his mother-in-law in Pasadena and Merritt called him on the telephone and requested him to come to the Tagus Ranch immediately and "straighten out" the matter of the sale of the cattle to the defendants. Loughery did not go to the Tagus Ranch in response to said request, and, although Merritt heard of his having been a few days later in the county of Tulare, did not see him and had not heard from or of him from that time until the time of the trial of this action. In connection with the statement of the facts thus far made it should be said that Davidson, foreman of Loughery, testified that Loughery instructed him "to say to anybody connected with the Pacific States Corporation" who might make inquiries about the steers that they were in the mountains, and that Merritt having subsequently, and after the cattle had been sold to the Gill Brothers, asked where the steers were, Davidson, in obedience to Loughery's instruction, told him that "they were in the mountains."

We come now to a consideration of the testimony which it is claimed supports the theory upon which the defendants insist that they are entitled to an affirmance of the judgment, to wit, that Loughery, in disposing of the cattle to the Gill Brothers, was vested with full authority so to do by the plaintiff. Said testimony may be briefly stated as follows: As above shown, Fred Gill, who conducted the negotiations resulting in the sale of the cattle by Loughery to the defendants, admitted that he met the former for the first time a few days only prior to the day in December, 1915, on which the first "bunch" of the steers was purchased; that Loughery was introduced to him by one James H. Townsend as the agent of the plaintiff. Of other previous transactions of Loughery, acting for plaintiff, Fred Gill, at the date of the first purchase, had no knowledge.

Townsend testified that in the summer of 1915, he was employed by Loughery to work on the Tagus Ranch for two

days; that Loughery gave him his (Loughery's) personal check for the sum due for the services so performed, but that within a brief time thereafter he received a draft from "the Tagus people" in payment for the same services, and that thereupon he returned to Loughery the money he received on the check or draft the latter had given him. This witness testified that a day or two before the purchase of the first lot of cattle by the Gill Brothers he introduced Loughery to Fred Gill as "the foreman on the ranch out there," and added: "I had always known him as such."

Len Bequette testified that, at some time in the fall of 1915, Merritt, manager of plaintiff, stated to witness that Loughery was one of his foremen.

George E. Waddell stated that he accompanied his son to the Tagus Ranch some time in the latter part of 1915 or the first part of 1916, his son having gone to said ranch to buy some cattle; that at that time he did not hear any negotiations between Loughery and his son regarding the purchase of cattle; that at the time the cattle were selected and weighed, Mr. Merritt, Jr., was present, and that the only part that Loughery took in the transaction, so far as he observed, was to assist in selecting and weighing the cattle.

G. H. Waddell, son of the witness last above named, stated that at the time referred to by his father he purchased some cattle from the Tagus Ranch, the transaction being carried on by Loughery. He further stated that, a short time previously to the purchase of the cattle, he met Loughery at the town of Tulare and that the latter stated to him that he had charge of the cattle at the Tagus Ranch and had some there he would like to sell to the witness; that Loughery said that the cattle were not at that time in good form, but that he was feeding them and that he agreed with Loughery to purchase a number of head; that in the month of January, 1916, he went to the Tagus Ranch and selected the cattle and he and Loughery together weighed them. The witness further testified that he did not remember whether he gave Loughery the check for the cattle at the Tagus Ranch at the time of the purchase or whether Loughery "came to Lindsay for it. I was doing business at Lindsay; had a butcher business at that time." He also testified that he saw Merritt, Jr., at the Tagus Ranch at the time that the purchase was made, but that he had no conversation

with him about Loughery, and that he had no conversation with Merritt about settling for the cattle; that "Mr. Loughery did that."

H. C. Heizeg testified that he had business transactions with the plaintiff in the years 1913, 1914 and 1915; that in 1915 he sold some mules to Loughery and that the latter gave him a check for the amount the sale came to but he could not state whether it was a Tagus Ranch check or Loughery's own personal check. He also stated that all he knew of the nature of Loughery's business relations with the plaintiff was what he was told by a Mr. Hollingsworth, who worked on the Tagus Ranch and who said to the witness that Loughery wanted to buy some mules for the ranch.

The foregoing testimony was given by witnesses for the defendants. There were some twelve or more other witnesses who testified for the defendants, but, as the transactions which they testified they had had with Loughery on the Tagus Ranch were of the same general character as those testified to by the witnesses last above named, no useful purpose could be subserved by reproducing their testimony herein.

[1] Conceding that the evidence produced by the defendants and of which the above is a summarized statement is sufficient to warrant the inference that Loughery was, at the time of the consummation of the transactions involved in this litigation, an agent of the plaintiff having general power to buy and sell stock for the latter, still it is very clear that said evidence falls far short of showing or even tending to show that in the transactions concerned herein he was authorized to negotiate and consummate the sale of the cattle described in the written contract between him and the plaintiff. Indeed, it may be conceded that Loughery, while employed as a foreman on the Tagus Ranch, was authorized by the plaintiff to buy and sell cattle and other domestic animals for the latter, and yet that fact would not be proof of authority having been vested in him by the plaintiff to sell the cattle described in the written contract to the defendants or, for that matter, to any other person or persons. The transaction relating to the cattle sold by Loughery to the defendants was a special or particular one between the plaintiff and Loughery and had no reference to or connection with any other contractual relations existing

between the plaintiff and Loughery. In other words, it was an independent transaction and was the subject of a special contract, reduced to writing, whereby the plaintiff agreed to and did, upon certain specified terms and conditions, turn over to Loughery the possession of said cattle for a specified purpose. In fact it was, in effect, a contract of bailment and under it Loughery was a depositary of the cattle for hire. It provided, among other things, as we have seen, that ''said cattle shall be marketed only at such times and for such price as shall be mutually agreed upon by said Pacific States Corporation and said Loughery.'' Thus it will be observed that, even if it be true that Loughery was, at the time of the execution of said contract, an agent of the plaintiff with general powers with respect to the sale and purchasing of other domestic animals for the former, there is nothing in the evidence which shows or tends to show that Loughery was authorized to sell the cattle described in the contract in the absence of an agreement upon the part of the plaintiff that he might do so. Indeed, nothing could be clearer than that Loughery had no authority to sell the cattle referred to in the contract under any general power he might have had as an agent of the plaintiff to sell other cattle or livestock for the latter. And it is equally clear that, as pointed out above, the evidence tending to establish authority in Loughery to sell cattle or other livestock for the plaintiff other than those mentioned in the contract in question does not tend to show that there was, as the written contract referred to provided, an agreement by the plaintiff with Loughery that the latter had authority to sell the steers referred to in said contract. In other words, while the evidence produced by the plaintiff tends to show that Loughery, while acting as foreman on the Tagus Ranch, had the authority as such foreman to buy and sell cattle and other stock for the plaintiff, still the proof so adduced does not show nor tend to show that it had been mutually agreed between plaintiff and Loughery that the steers which were made the subject of the special written contract between said parties should be sold or marketed by Loughery at the times and for the prices at which the latter sold the steers to the defendants or that he had any authority to sell them at the times that he disposed of them to the defendants.

[2] Where, as here, the authority to do a particular act under a written contract between two parties must alone be found in the contract itself, or, in other words, where authority to do an act by one party to a written contract cannot be exercised except upon the express agreement or consent of the other party thereto, mere evidence of the fact that the party assuming to perform such act was, prior to and at the time of the making of such written contract, the agent of the other cannot of itself justly be held to be proof of authority given to the agent by the principal to do such act. Indeed, the very fact that as to the cattle in question and the condition upon which they were to be marketed by the parties a special contract was made, and the further fact that the cattle were to be and were removed to Loughery's Ranch from the Tagus Ranch, themselves constitute convincing evidence that the intention was to take the subject matter of said contract from within the scope of any authority Loughery might have had prior to and at the time of the making of the contract to buy and sell cattle or other domestic animals for the plaintiff other than those described in the said contract, and, therefore, to show that Loughery disposed of the cattle in question to the Gill Brothers by and with the consent of the plaintiff, there should have been evidence, either direct or circumstantial, disclosing that such consent had been obtained or that the sale of the steers to the defendants was by and through the mutual consent and agreement of both plaintiff and Loughery. There was, as we have shown, absolutely no such testimony introduced into the case.

[3] The third defense interposed by the defendants involves the claim that the plaintiff received and accepted from Loughery its share of the purchase price of the cattle and that thus it ratified the sale made by Loughery to the defendants. The defendants offered in evidence a draft issued on the fourteenth day of February, 1916, by the National Bank of Visalia upon the First National Bank of Los Angeles, payable to G. H. Loughery for the sum of $1,962.24 and indorsed "Pacific States Corporation, by C. H. Dickinson, Secretary." This draft, having been issued near the time at which the second lot of cattle was sold by Loughery to the defendants, was offered in evidence by the latter upon the theory that it was in payment to plaintiff for its

interest in said second lot of cattle so sold.  Further than the mere check itself, the defendants presented no evidence showing the particular purpose for which the check was delivered to the plaintiff by Loughery.  On the other hand, C. H. Dickinson, secretary, auditor, and assistant treasurer of the plaintiff at the time that said check was received by the latter, testified that the check was in payment for neither of the two lots of cattle sold to the Gill Brothers but was to pay for cattle which Loughery had sold to G. H. Waddell. The testimony of Dickinson as to this matter is as follows: ''I did not receive from George H. Loughery, in any month in 1916, or at any other time any money on account of the sale of the Gill cattle or of the cattle to Gill.  The corporation did not receive any such remittance; if the corporation had received it, I would most certainly have known it. . . . I know for what purpose that check was received by the plaintiff; it was in payment for cattle sold by Loughery to George H. Waddell.''  And in this connection it should be stated that the plaintiff offered in evidence a letter which Dickinson said came with the check referred to, the offer having been made on the ground that it explained the purpose for which the check was sent to the plaintiff, and that the court sustained the objection of the defendants to the admission of the evidence on the ground that, the same having been signed by ''George H. Loughery, per H,'' no showing was made that Loughery either dictated the letter or that it was written under his direction or by his authority.    Merritt, Jr., general manager of plaintiff, testified, as we have already shown, that neither he nor the corporation learned of the sale of the cattle to Gill Brothers by Loughery until the month of March, 1917, over a year after the last lot of cattle was sold and the check in question was received by the corporation from Loughery.  He further stated that the plaintiff received a check in February, 1916, for the amount approximately of the check in question, but explained that it was for the sale of cattle by Loughery without plaintiff's consent; that he had learned of the sale of cattle by Loughery to persons other than the Gill Brothers through pressing the persons to whom the cattle were so sold, and that he thereupon forced Loughery to draw his check for the amount and then discharged him from the employment of the company.

It is first to be remarked that there is no presumption that the check referred to was delivered to the plaintiff as in payment of the latter's interest in the purchase price of any of the cattle sold by Loughery to the Gill Brothers, but even if it might be said that the circumstance of the receipt of the check near the time at which the last lot of cattle was sold to Gill afforded such an inference, such inference is clearly overcome by the testimony of Dickinson and Merritt to the effect that the check was not given for said purpose, and which testimony must be accepted as revealing the truth of the matter, since there is absolutely no contradiction thereof. Moreover, Merritt testified (and his testimony as to this is nowhere contradicted) that the corporation first learned of the transactions involving the sales of the cattle to the Gill Brothers in the month of March, 1917, which, as above stated and as is obviously true, was over a year after the last sale to Gill Brothers was made. It follows that, if Loughery intended the said check for $1,962.24 as in payment of the plaintiff's share of the proceeds derived from the sale of the last lot of cattle to the Gill Brothers, neither the plaintiff nor any of its officers knew that such was the purpose of said payment, and certainly it will not be contended that the plaintiff, not having any knowledge of the sale of the cattle to Gill Brothers or that the check was sent by Loughery with the intention that it should go in payment of its share of any moneys received on said sales, had ratified the transactions involving said sales. A party cannot be held to have ratified an act of which he had no knowledge at the time of the alleged act of ratification.

There are numerous exceptions to the rulings of the court on the evidence and certain assignments of error as to certain instructions given and refused. In view of the conclusion at which we have arrived as to the effect of the evidence introduced for the purpose of showing that Loughery was authorized to sell the cattle, these assignments need not be specifically noticed herein. We may assume that, upon a retrial, the trial court will avoid the repetition of any errors either in the rulings or in the matter of the giving or refusing to give instructions into which it might have fallen at the trial of which this appeal is the outgrowth. It is hardly necessary to suggest, however, that in the event of a retrial of the cause, the letter which was above referred

to as having accompanied the check for $1,962.24 received by the plaintiff from Loughery, should be admitted, provided it be shown that it was either written by Loughery himself or by someone under his direction and that its contents are explanatory of the precise purpose for which Loughery transmitted the check to the plaintiff. (Sec. 1854, Code Civ. Proc.)

The judgment is reversed and the cause remanded.

Burnett, J., and Finch, P. J., concurred.